IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **BILLY MARQUIS,** *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | Civil Action No. 4:19-cv-626-KPJ |
| | § | |
| **KHOSROW SADEGHIAN and** | § | |
| **AMY JO SADEGHIAN,** | § | |
| | § | |
| **Defendants.** | § | |

## OPINION AND ORDER

Pending before the Court is Defendants Khosrow Sadeghian ("Khosrow Sadeghian" or "Sadeghian") and Amy Jo Sadeghian (together, "Defendants" or "Sadeghians") Motion for Summary Judgment (the "Motion") (Dkt. 176). The Motion (Dkt. 176) is fully briefed. *See* Dkts. 177, 178, 179, 181. Having considered the briefing, the summary judgment evidence, and the applicable law, the Court finds the Motion (Dkt. 176) is **GRANTED IN PART** and **DENIED IN PART**.

## I.      BACKGROUND

### A.  Factual Background

This lawsuit stems from Defendants' alleged employment of Plaintiffs Billy Marquis ("Billy Marquis" or "Marquis"), Alexis Marquis, and Anthony Marquis (together, "Plaintiffs"). *See generally* Dkt. 151. In their third amended complaint (the "Third Amended Complaint") (Dkt. 151), Plaintiffs assert claims under the Fair Labor Standards Act (the "FLSA") and the Texas

1

Deceptive Trade Practices Act ("DTPA"), and Billy Marquis asserts a negligence claim, against Defendants. *See id.* at 5–7.[1]

The following facts are undisputed. Billy Marquis is the father of Alexis Marquis and Anthony Marquis. *See* Dkt. 151 at 1; Dkt. 159 at 2. Amy Jo Sadeghian and Khosrow Sadeghian are husband and wife. *See* Dkt. 151 at 1. Through Kamy Real Estate Trust, the Sadeghians owned residential properties in Texas. *See* Dkt. 151 at 2; Dkt. 159 at 2. Khosrow Sadeghian uses Kamy Investments, Kamy Real Property Trust, and Kamy Real Estate Trust in doing business. *See* Dkt. 151 at 2; Dkt. 159 at 3. Billy Marquis first met Khosrow Sadeghian in September 2014. *See* Dkt. 151 at 2; Dkt. 159 at 3. When Marquis and Sadeghian first met, Marquis was working as a truck driver. *See* Dkt. 151 at 2; Dkt. 159 at 3. Sadeghian told Marquis that if Marquis moved with his family to North Texas, Sadeghian would hire Marquis to do maintenance and repairs on the Sadeghians' properties. *See* Dkt. 151 at 3; Dkt. 159 at 3.

The details regarding the work Plaintiffs performed for Defendants is largely disputed. Sadeghian testified that generally, "there was nobody [at the work sites] watching [Plaintiffs] all day or anything like [that]," "[Defendants] had no control over [Marquis]", and that "occasionally" Defendants sent managers to the work sites to "kind of pass by . . . to see . . . what's going on." Dkt. 176-4 at 31:19–25, 32:1–5. Sadeghian testified that he did not require Plaintiffs to work certain hours; rather, he only set deadlines by which work was to be completed. *See id.* at 44:1–9. To the contrary, Marquis swore that "[t]he Sadeghians told us what to do, when to do it, and how to do it" and that "[w]e were ordered to work at least five days a week and frequently six or seven." Dkt. 177-1 at 21–22.

---

[1] While spoliation is listed in the Third Amended Complaint as a "Count," it appears Plaintiffs did not intend to assert spoliation as a separate cause of action. Dkt. 151 at 7. The Court will discuss this issue in further detail *infra*.

Further, Marquis alleges that around sunset on February 26 or 27, 2018,[2] Defendants instructed Plaintiffs to perform repairs on one of Defendants' houses, which Defendants knew to be dilapidated and without lighting, rendering it a dangerous house on which to work after dark. *See* Dkt. 151 at 4. Marquis alleges Defendants continued to demand Plaintiffs work on the house, despite Plaintiffs' protestations that such work was too dangerous. *See id.* Marquis alleges that as he was performing repairs on the house, he "stepped on the unsecured threshold of a door" and the door "gave way, plunging him into the crawl space and breaking both bones in his lower leg and his ankle." *Id.* Defendants deny the allegations. *See* Dkt. 159 at 5.

Finally, Plaintiffs allege Sadeghian promised Marquis that if he moved his family from Houston to North Texas, Sadeghian would pay Marquis between $3,000 and $4,000 per month to do maintenance on the Sadeghians' properties and provide free lodging to Plaintiffs. *See* Dkt. 151 at 2–3. Plaintiffs allege Sadeghian deceived Marquis, as Sadeghian did not pay Marquis the promised amount, Sadeghian charged Marquis rent for the property on which Plaintiffs resided, and the property was uninhabitable. *See id.* at 3, 6. Defendants deny the allegations. *See* Dkt. 159 at 6.

### B.  Procedural History

Plaintiffs brought this case on August 27, 2019, individually and on behalf of others similarly situated. *See* Dkt. 1. On January 21, 2022, Plaintiffs' Motion to Certify Class Collective Action (Dkt. 115) was denied. *See* Dkt. 143. On June 23, 2022, Plaintiffs filed the Third Amended Complaint (Dkt. 151), in which they assert claims as individuals only. *See* Dkt. 151. After the close of discovery, *see* Dkt. 169, on November 23, 2022, Defendants filed the Motion (Dkt. 176). On

---

[2] In the Third Amended Complaint (Dkt. 151), Marquis alleges the incident took place on February 26, 2018. *See* Dkt. 151 at 4. In a declaration, Marquis swore that the incident took place on February 27, 2018. *See* Dkt. 177-1 at 64.

December 14, 2022, Plaintiffs filed a response in opposition to the Motion (Dkt. 177), and on December 15, 2022, Plaintiffs filed a supplement to their response (Dkt. 178). On December 21, 2022, Defendants filed a reply (Dkt. 179). On January 19, 2023, Plaintiffs filed a sur-reply (Dkt. 181).

## II.    LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (citations omitted). The summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To sustain this burden, the movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (en banc) (emphasis omitted) (citing *Celotex*, 477 U.S. at 323). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citation omitted).

In response, the nonmovant "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). The citations to evidence should be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. LOCAL RULE CV-56(c); *see also* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks omitted).

"When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

### III.   ANALYSIS

In the Motion (Dkt. 176), Defendants seek summary judgment on all claims asserted by Plaintiffs in the Third Amended Complaint (Dkt. 151). For the reasons discussed below, the Court grants the Motion (Dkt. 176) as to Plaintiffs' DTPA claim and denies the Motion (Dkt. 176) as to Plaintiffs' FLSA claim and Marquis's negligence claim.

### A.  FLSA

Defendants argue the undisputed facts show that as a matter of law, Plaintiffs were independent contractors, not employees, and therefore, Defendants cannot be liable to Plaintiffs

under the FLSA. *See* Dkt. 176 at 7–12. Plaintiffs respond that the facts underlying whether Plaintiffs were employees or independent contractors are entirely disputed, and therefore, summary judgment is inappropriate. *See* Dkt. 177 at 3–11.

Congress enacted the FLSA in 1938 after finding "'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (quoting 29 U.S.C. § 202(a)). The FLSA mandates that as to covered employers and employees, "no employer shall employ any of his *employees* . . . for a workweek longer than forty hours unless such *employee* receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1) (emphases added). If an employer violates the overtime-compensation requirement, it is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." *Id.* § 216(b). By contrast, independent contractors are not entitled to overtime under the FLSA. *See Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 272 (5th Cir. 2020) (citing 29 U.S.C. § 207(a)(1)). The ultimate determination regarding whether a worker is an employee or independent contractor is a question of law. *See Brock v. Mr. W Fireworks*, 814 F.2d 1042, 1045 (5th Cir. 1987).

In order to establish a *prima facie* case under the FLSA, the plaintiff must demonstrate, among other elements, that an employer-employee relationship existed during the unpaid overtime periods claimed. *See Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citations omitted). The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "Given the remedial purposes of the [FLSA], an expansive

6

definition of 'employee' has been adopted by the courts." *Parrish*, 917 F.3d at 378 (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976)); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

In determining whether workers are employees or independent contractors, the "pertinent question is 'whether the alleged employees, as a matter of 'economic reality,' are 'economically dependent' on the business to which they supply their labor and services." *Parrish*, 917 F.3d at 379 (quoting *Mr. W. Fireworks*, 814 F.2d at 1043). "Essentially, [the court's] task is to determine whether the individual is, as a matter of economic reality, in business for himself." *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993) (citing *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981)). In making this determination, courts evaluate the facts based on five non-exhaustive factors articulated in *Silk v. United States*, 331 U.S. 704 (1947). *See Parrish*, 917 F.3d at 377. The *Silk* factors include:

> (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship.

*Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008) (citation omitted). The findings as to these factors are questions of fact. *See Mr. W. Fireworks*, 814 F.2d at 1044 ("Findings as to control, investment, skill and initiative, opportunity for profit and loss, and permanency are plainly and simply based on inferences from facts and thus are questions of fact."). In the legal determination of employee or independent contractor, "[n]o single factor is determinative. Rather, each factor is a tool used to gauge the economic dependence of the alleged employee, and each

must be applied with this ultimate concept in mind." *Hopkins*, 545 F.3d at 343 (citing *Mr. W. Fireworks*, 814 F.2d at 1043–44).

The Court will analyze each of the five factors in turn, with "economic dependence" as the ultimate inquiry.

### 1. *Degree of Control*

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 830 (5th Cir. 2020) (internal quotations and brackets omitted). "'[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence.'" *Hopkins*, 545 F.3d at 343 (quoting *Mr. W. Fireworks*, 814 F.2d at 1049).

Defendants generally assert "the evidence shows that Plaintiff, Billy Marquis had control over his day-to-day projects as he was able to begin and stop work when he wanted and while performing services he was able to designate what steps to take, and exercised complete control with respect to how the projects were managed." Dkt. 176 at 8. Defendants further argue that Marquis was "allowed . . . to pick and choose the jobs he thought would be good for his team." Dkt. 176 at 8–9. Defendants cite Khosrow Sadeghian's testimony that he did not set the workers' hours, there generally was no one overseeing Plaintiffs as they worked, and he only occasionally sent people to monitor Plaintiffs' work. *See* Dkt. 176 at 8 (quoting Dkt. 176-4 at 31:19–25, 32:1–17, 44:1–11). However, Plaintiffs cite evidence in the record that disputes these characterizations. For example, Plaintiffs cite a declaration in which Marquis swore that "[t]he Sadeghians told us what to do, when to do it, and how to do it," that "[w]e were ordered to work at least five days a week and frequently six or seven," and that if Marquis "was a few minutes late to [arrive] on a jobsite, [he] was likely to get a call from Mr. Sadeghian who cursed [him] out for being late." Dkt.

177 at 3–4 (quoting Dkt. 177-1 at 20–21). Plaintiffs further cite a declaration of Paul Stansbery, who also performed work for the Sadeghians, in which Stansbery swore that the Sadeghians "controlled everything we did: when we worked, how long we worked, what days we worked, and what we were paid" and that "Billy [Marquis] had no control over any of those matters." *Id.* at 4 (quoting Dkt. 177-1 at 41).[3] *Id.* at 21. Plaintiffs cite another declaration in which Marquis swore that Amy Sadeghian would give the workers a "code sheet" and "designate which [task] needed to be done first." *Id.* at 3 (citing Dkt. 177-1 at 57).[4]

Accordingly, the facts underlying this factor are disputed by the parties.

---

[3] Defendants argue the declarations of Paul Stansbery, Ana de Luna, and others should "be struck as hearsay as they are not a party to this case." Dkt. 179 at 8. "Hearsay" means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. FED. R. EVID. 801(c). Hearsay is not admissible unless an exception applies. FED. R. EVID. 802. Further, the hearsay rule applies in the summary judgment context as it does at trial, meaning that evidence based on hearsay is not admissible as summary judgment evidence. *See State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 525 F. Supp. 3d 753, 755 (N.D. Miss. 2021) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006); *Fowler v. Smith*, 68 F.3d 124, 125 (5th Cir. 1995)).

Plainly, one's status as a non-party does not itself make that person's statement hearsay, and courts routinely admit as evidence (at summary judgment and at trial) statements of non-parties. Further, Defendants do not provide any authority, and the Court has not found any, supporting the proposition that because Stansbery and de Luna were part of a putative class that earlier in this lawsuit was not certified, their statements are inadmissible. *See* Dkt. 179 at 8. Moreover, as part of their summary judgment evidence, Defendants provide declarations of Charlie Jones, who is not a party to this case. *See* Dkt. 176-2 at 3; 4–5.

[4] In the section of Defendants' brief dealing with this factor, Defendants also identify evidence related to the provision of materials. *See* Dkt. 176 at 9. The Court considers this evidence in the "Extent of the Relevant Investments" subsection of this opinion. In this section of Defendants' brief, Defendants also identify evidence related to Billy Marquis's advertising himself as an independent contractor and his tax ID registration. *See* Dkt. 176 at 9. The Court considers this evidence in the "Other Factors" subsection of this opinion.

Additionally, Defendants assert that "Defendant[s] also pulled permits for [Marquis] so that he could work his contract labor on those specific jobs." Dkt. 176 at 9. However, the evidence cited for this proposition does not appear to be related to this proposition. *See* Dkt. 176-3 at 24:17–24 (Marquis's testimony that Amy Sadeghian gave Marquis a "code sheet").

Finally, Defendants refer to "payroll records previously produced in discovery." Dkt. 176 at 9. Defendants have not put this evidence in the summary judgment record. Because the Court does not have access to this evidence, the Court cannot consider it.

2. *The Extent of the Relative Investments of the Worker and the Alleged Employer*

Defendants argue that Marquis's investment in Defendants' business was minimal or nonexistent and that Marquis invested heavily in his own business. *See* Dkt. 176 at 10; Dkt. 179 at 3. Plaintiffs contend Defendants misunderstand this factor. *See* Dkt. 177 at 5.

Plaintiffs are correct. This factor focuses not on investment in the employer's or the putative independent contractor's businesses themselves but rather investment in the job performed. *See Faulkner v. Patterson-UTI Drilling Co. LLC*, No. 6:12-CV-104, 2014 WL 12567150, at *4 (E.D. Tex. Jan. 30, 2014) ("Under Fifth Circuit precedent, each plaintiff's investment is balanced against the alleged employer's investment in the job at hand." (citing *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 847 (5th Cir. 2010))). This analysis often focuses on the investment in the materials necessary to perform the job. *See, e.g.*, *Thibault*, 612 F.3d at 847–48) ("[The plaintiff] provided his own bucket truck, cable splicer, pump, ventilator, ladder, climbing belt, harness, hard hat, safety vest and other miscellaneous tools."); *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding the plaintiffs' investment in delivery vehicles, insurance, radios, fuel, and delivery supplies insignificant compared to the defendant's investment in office space, office equipment, payroll, and other expenses).

Defendants argue that "Billy Marquis . . . stated he brought his tools to the job site." Dkt. 176 at 9. Plaintiffs argue, and the Court agrees, this selective statement is incomplete. *See* Dkt. 177 at 4. While Marquis testified that the workers brought their "personal stuff, like our hammers and things like that we wanted ourselves" and "cordless tools, things like that," he also testified that Sadeghian bought the "specialized tools" and "pretty much most of the tools." Dkt. 176-3 at 27:17–23. Accordingly, Defendants' argument is misleading, and any implication that Marquis

supplied all of the tools he needed is belied by Defendants' own evidence. Ultimately, Defendants do not cite any undisputed evidence in the record, properly considered in context, to support the contention that Defendants' investments in the work performed outweigh Plaintiffs' investments in the work performed.

3.   *The Degree to Which the Worker's Opportunity for Profit or Loss is Determined by the Alleged Employer*

"In evaluating this factor, it is important to determine how the workers' 'profits [depend] on their ability to control their own costs.'" *Parrish*, 917 F.3d at 384 (quoting *Carrell*, 998 F.2d at 334). Additionally, courts look to "whether the putative employer's control over the worker's schedule and pay had the effect of limiting the worker's opportunity, as an independent contractor, for profit or loss." *Hobbs*, 946 F.3d at 832 (citing *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x. 57, 61 (5th Cir. 2009) (per curiam)).

Defendants generally argue that Marquis "had the ability to make decisions and use his own managerial skill and initiative to determine whether or not he received more pay." Dkt. 176 at 10. Defendants more specifically argue Marquis "understood his compensation as a contractor." *Id.* As support for this proposition, Defendants cite the following from Marquis's deposition testimony:

Q: So what was your understanding originally of your pay compensation structure?

A: About $4,000 a month.

*Id.* (citing Dkt. 176-3 at 2:17–19). This testimony merely indicates Marquis's understanding of how much he was to be paid per month; "as a contractor" is a conclusion by Defendants that is not affixed to any statement in Marquis's testimony. Moreover, Marquis's testimony suggests Plaintiffs were hired on an ongoing basis (per month) as opposed to a project-by-project basis. Being hired on a project-by-project basis suggests the worker is an independent contractor,

11

whereas being hired on an ongoing basis suggests the worker is an employee. *Compare Carrell*, 998 F.2d at 332 (finding independent contractor status where, among other things, the defendant "hired the [employees] on a project-by-project basis") *with Cromwell*, 348 F. App'x. at 60 (finding employee status where, among other things, the plaintiffs "did not have the same temporary, project-by-project, on-again-off-again relationship with their purported employers as the plaintiffs in *Carrell* did with their purported employer").

Further, Defendants argue the "discretionary bonuses" Marquis had the opportunity to earn is evidence of his opportunity for profit or loss. Dkt. 176 at 10. Defendants cite the following from Marquis's deposition testimony:

> A: We were getting a $100 [bonus] every month. We would get $100 at the end of the month. We would get a $50 bonus in the middle of the month.

*Id.* (citing Dkt. 176-3 at 85:8–10). Without more context, this testimony is attenuated from the question of whether Plaintiffs had an opportunity to earn a profit by their own skill and initiative. Rather, this testimony only suggests Plaintiffs were paid bonuses at regular intervals. Ultimately, Defendants do not cite any undisputed evidence in the record, properly considered in context, which supports their contention that Plaintiffs had the ability to make decisions and use their own managerial skill and initiative to determine whether or not he received more pay.

### 4. The Skill and Initiative Required in Performing the Job

Courts "look for some unique skill set . . . or some ability to exercise significant initiative within the business." *Hopkins*, 545 F.3d at 345 (citations omitted). "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Pilgrim Equip. Co.*, 527 F.2d at 1314 (citations omitted).

Defendants assert that Marquis "owned his own construction company [Marquis Brothers] and had experience in rehabilitating houses and making them better." Dkt. 176 at 11. Defendants'

argument appears to be that because Marquis owned a construction and remodeling business, and thus had skills related to the construction and remodeling of homes, the work that Plaintiffs performed related to repairs on homes necessarily means the work was skilled work. However, the only undisputed facts in the record regarding the work Plaintiffs performed for Defendants is that Sadeghian told Marquis that if Marquis moved with his family to North Texas, Sadeghian would hire Marquis to do "maintenance and repairs on the Sadeghians' properties." Dkt. 151 at 3; Dkt. 159 at 3 (admitting this allegation). Defendants have not cited any evidence that indicates what "maintenance and repairs" actually entailed. Without such evidence, the Court cannot determine whether the work was skilled or unskilled.[5]

### 5. *Permanency of the Relationship*

"This factor considers the length of time the alleged employee worked for the employer, the basis on which the worker is hired, and the exclusivity of the work." *Faulkner*, 2014 WL 12567150, at *5.

Defendants assert that Marquis "had the ability to work on projects for [Sadeghian] but was not beholden to him and was never required to work for him" and that Marquis "owned his own contracting business[,] was able to do other work, if he wanted, and did work for other before he worked . . . for Defendant." Dkt. 176 at 11. Defendants further assert that Marquis "worked on other projects and Defendants [sic]." *Id.* Defendants cite the following exchange in Marquis's deposition:

---

[5] As to this factor, Defendants also assert that Marquis "hired his own team of subcontractors to work with him, and chose the projects he wanted to work on." Dkt. 176 at 11. Defendants cite the following from Marquis's deposition testimony: "I was the one telling [the workers] after I got orders from the – Amy and Khosrow Sadeghian." *Id.* (citing Dkt. 176-3 at 14:5–6). In other words, Marquis testified he received orders from the Sadeghians and relayed those orders to other workers. The Court is not sure how this testimony, without more, supports Defendants' broader proposition that Marquis hired his own team of subcontractors and chose the projects on which he wanted to work. Moreover, Plaintiffs cite evidence that Defendants assigned workers to work with Plaintiffs. *See* Dkt. 177 at 9 ("Around the time [Marquis's son-in-law] joined Plaintiffs, the Sadeghians began to assign other [workers] to work with us." (quoting Dkt. 177-1 at 7)).

Q: And how are you presently employed?

A: I'm not.

Q: Unemployed?

A: My business went under . . . .

Q: So when did your business close?

A: Back – after COVID started . . . .

Q: 2020 or –

A: Yeah, it's been over a year . . . .

Q: Okay. So your business was Marquis Brothers?

A: Marquis Brothers General Construction and Remodeling.

Dkt. 176-3 at 7:24–25; 8:1–3, 13–16, 22–24. This testimony indicates that, as of 2020, Billy Marquis owned a business called Marquis Brothers General Construction and Remodeling. Further, Marquis testified that Marquis Brothers began in the 1990s as a roofing company, the company stopped doing roofing a year after the company started operating, and then Marquis Brothers became a "full blown trucking company." Dkt. 176-3 at 93:17–24. Therefore, while the existence of Marquis Brothers before and after the time Plaintiffs performed work for Defendants is not disputed, Defendants' cited evidence does not indicate the status of Marquis Brothers during the time Plaintiffs performed work for Defendants.[6] Further, Plaintiffs cite a declaration in which

---

[6] Defendants cite a "resignation letter," which contains language ostensibly written by Billy Marquis that he was "not physically able to continue the work I have been contracted to do" and that in the wake of his resignation, "Kamy Real Property Trust is going to sub-contract Marquis Brother's to maintain all properties." The letter concludes that "[t]his is an agreement set-forth between Marquis Brother's and Kamy Real Property Trust." Dkt. 176-2 at 6. The letter contains a signature that Defendants contend is that of Billy Marquis. *See id.* Plaintiffs dispute the authenticity of this letter, as Marquis swore that he never saw or signed this document and that his digital signature was pasted onto the document, without his knowledge. *See* Dkt. 177-1 at 64. Because Defendants have not included a declaration or affidavit properly authenticating this "resignation letter," it is not admissible as summary judgment evidence. *See Washington v. Tyson Foods, Inc.*, No. 9:17-CV-126, 2018 WL 3603092, at *2 (E.D. Tex. June 27, 2018) ("[A]ll other evidence proffered by [the plaintiff] is inadmissible and not considered because [the plaintiff] failed to include a

Marquis swore that all Marquis Brothers advertisements on social media postdate Plaintiffs' time performing work for Defendants. *See* Dkt. 181 at 5 (quoting Dkt. 181-2 at 2). Moreover, Defendants' arguments about what Plaintiffs could have done, as opposed to what they in fact did, are misplaced. *See Parrish*, 917 F.3d at 380 ("[I]t is not what [plaintiffs] could have done that counts, but as a matter of economic reality what they actually do that is dispositive.").

Regarding economic reality, importantly, Defendants do not cite to any evidence in support of their contention that Marquis worked on other projects during the time he performed work for the Sadeghians. *See* Dkt. 176 at 11. Moreover, Plaintiffs cite a declaration in which Marquis swore that "in the roughly four years I worked for the Sadeghians, I never worked for anyone else." Dkt. 177 at 11 (citing Dkt. 177-1 at 63).[7] Working exclusively for a putative employer for four years suggests the worker is an employee, not an independent contractor. *Compare Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir. 1983) (finding workers were employees where,

---

declaration or affidavit authenticating the various documents she proffers as evidence." (citing *United States v. Heerwagen*, 993 F.2d 1543, 1546, n.7 (5th Cir. 1993) (per curiam); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991))).

[7] Defendants argue this declaration should be struck as hearsay. *See* Dkt. 179 at 7–8. Defendants assert broadly that "some of the assertions contained in the affidavit are hearsay," but Defendants do not identify which statements they believe are hearsay. *Id.* at 8. At summary judgment, a party may support his assertion with, among other things, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fᴇᴅ. R. Cɪᴠ. P. 56(c)(4). As to the statement here, Defendants have not suggested any reason to believe that Billy Marquis does not have personal knowledge of how long he performed work for the Sadeghians and whether he performed work for others during that period, that such evidence would be inadmissible at trial, or that Marquis is not competent to testify as to these facts.

Additionally, Defendants argue "this affidavit was not contained in the record" and this "newly conducted declaration should be struck from the record." Dkt. 179 at 8. It is not clear what is meant by this objection, but it appears Defendants are arguing this declaration should be struck because it was created in response to the Motion (Dkt. 176). Defendants do not provide any authority for this proposition, and the Court has found none. Moreover, courts admit as summary judgment evidence declarations made in response to motions for summary judgment. *See, e.g.*, *Adams v. United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry*, 469 F. Supp. 3d 615, 643 (M.D. La.), *on reconsideration in part*, 495 F. Supp. 3d 392 (M.D. La. 2020) (finding a declaration admissible as summary judgment evidence where "it was clearly drafted and signed after [the motion for summary judgment] was filed").

among other things, "[t]he duration of the relationship was from ten months to three years for each of [the workers]—a substantial period of time—and except for insignificant work elsewhere, was exclusively with [the defendant]") *with Carrell*, 998 F.2d at 332 (finding workers were independent contractors where, among other things, they worked for defendant for three to sixteen weeks per year and frequently moved between jobs).

### 6.  *Other Factors*

Defendants cite evidence that Marquis advertised on Angie's List that he's a certified contractor and that Marquis had a tax ID registration for his construction business. *See* Dkt. 176 at 9 (citing Dkt. 176-3 at 90:9–11, 95:2–8). Additionally, Defendants cite a copy of a check, payable to Marquis, on which Marquis wrote that he and his "subcontractors" would accept certain payment terms. *See* Dkt. 176 at 9 (citing Dkt. 176-2 at 7).[8] The Court first notes that from the evidence cited by Defendants, it is not clear if Marquis had the certified contractor posting while he performed work for Defendants. More fundamentally, while labels are relevant, they are not controlling, as the touchstone of the employee or independent contractor analysis is economic reality. *See Robicheaux*, 697 F.2d at 667 ("[T]he fact that the [workers] in this case signed contracts stating that they were independent contractors, while relevant, is not dispositive. Likewise, the fact that they . . . listed themselves as self-employed on their tax returns, and had their own business cards and letterheads, does not tip the balance in favor of independent contractor status where, as

---

[8] Plaintiffs object to the admission of this evidence because "[i]t was not produced in discovery." Dkt. 177 at 18. "The law is very clear: evidence that was not properly produced during discovery cannot be used to support or oppose summary judgment." *Morris v. Copart*, No. 4:15-CV-724, 2016 WL 6608874, at *3 (E.D. Tex. Nov. 9, 2016) (quotation omitted). If a document has improperly not been produced in discovery, courts then conduct a four-factor test to determine whether the failure to comply with the discovery obligation was harmless. *See Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003) (citation omitted). However, besides stating that this evidence "was not produced in discovery," Plaintiffs do not elaborate how Defendants' not turning over this piece of evidence failed to satisfy Defendants' discovery obligations. *Cf. Reuter v. XTO Energy, Inc.*, No. 4:20-CV-01474, 2022 WL 2712860, at *2 (S.D. Tex. July 13, 2022). Ultimately, even if the Court considers this evidence, it does not change the Court's analysis as to whether Plaintiffs were employees or independent contractors.

here, the economic realities of the situation indicate that the employee depended upon the employer for his livelihood."). Accordingly, this evidence does not change the Court's conclusion that there is insufficient undisputed evidence in the record to conclude that, as a matter of economic reality, Plaintiffs were independent contractors.

### 7.   *Conclusion*

As to the foregoing factors, Defendants have either failed to cite record evidence supporting a conclusion that Plaintiffs were independent contractors, or, where Defendants have cited such evidence, Plaintiffs have in turn cited evidence showing the facts underlying that factor are in dispute. Overall, there is insufficient undisputed evidence showing that as a matter of "economic reality" Plaintiffs were "in business for [themselves]." *Carrell*, 998 F.2d at 332 (citation omitted). Accordingly, the Court is unable to conclude as a matter of law that Plaintiffs were independent contractors. As to Plaintiffs' FLSA claim, the Motion (Dkt. 176) is therefore denied.

### B.   **Negligence**

Defendants argue that because Marquis was an independent contractor, Defendants cannot be liable in negligence for work Marquis performed on Defendants' properties. *See* Dkt. 176 at 12–13.[9] Plaintiffs argue that genuine issues of fact preclude a finding that Marquis was an independent contractor, and therefore, Defendants' argument fails. *See* Dkt. 177 at 13.

Under Texas law, "'[t]he elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540–41 (5th Cir. 2005) (quoting *HS Cedars Treatment Ctr. of*

---

[9] For their negligence argument, Defendants incorporate by reference the same evidence they identified as to their FLSA argument. *See* Dkt. 176 at 12–13.

*Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)). In Texas, "determining whether an individual is acting in the capacity of an 'independent contractor' or as an 'employee' requires assessment of the amount of control the employer exerts or has the right to exert over the 'progress, details, and methods of operations of the work.'" *Mid-Continent Cas. Co. v. Davis*, 683 F.3d 651, 655 (5th Cir. 2012) (quoting *Limestone Prod. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) (per curiam)). Courts measure the right to control by considering:

> (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and material to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job.

*Limestone*, 71 S.W.3d at 312 (citations omitted). If the controlling facts are disputed, whether a person is an employee or an independent contractor is a question of fact. *See Campbell v. Keystone Aerial Survs., Inc.*, 138 F.3d 996, 1006 (5th Cir. 1998) (citing *Halliburton v. Tex. Indem. Ins. Co.*, 213 S.W.2d 677 (1948)). If there is no dispute as to the controlling facts and only one reasonable conclusion can be drawn from those facts, the question is one of law. *See id.* (citing *Indus. Indem. Exch. v. Southard*, 138 Tex. 531, 160 S.W.2d 905, 906 (1942); *Wackenhut Corp. v. Perez*, 865 S.W.2d 86 (Tex. App.—Corpus Christi 1993, writ denied)).

As a general matter, there is a genuine issue of material fact as to Defendants' right to control Plaintiffs' work, which precludes a finding as a matter of law that Plaintiffs were independent contractors.[10] Analysis under the five factors articulated in *Limestone* buttresses this conclusion. As to the first three factors, Defendants have either not adduced evidence that supports a finding that Plaintiffs were independent contractors or there is a genuine dispute of material fact.

---

[10] In the Court's analysis as to Plaintiffs' FLSA claim, the Court found that the facts underlying whether in fact Defendants exercised control over Plaintiffs' work are disputed. The Court likewise concludes that the facts underlying the degree to which Defendants had a right to control Plaintiffs' work are disputed.

As to the fourth factor, there is evidence that Plaintiffs performed work for Defendants for four years (which supports a finding of employee). As to the fifth factor, Defendants' cited evidence indicates Plaintiffs were paid each month (which supports a finding of employee). Accordingly, for purposes of Billy Marquis's negligence claim, the Court cannot conclude at this stage that Marquis was an independent contractor.

Next, Defendants cite an affidavit in which Charlie Jones ("Jones") swore Marquis fabricated the details of his fall. *See* Dkt. 176 at 13 (citing Dkt. 176-2 at 3–5). Jones testified that he worked under Marquis's supervision and that "[a]fter [Marquis] befriended me, [h]e confided in me that he fell at home but seized the opportunity to make some cash in a settlement from Kamy Investments." Dkt. 176-2 at 3, 5. In response, Plaintiffs identify a declaration in which Marquis details the incident as having occurred at one of Defendants' properties. *See* Dkt. 177 (citing Dkt. 177-1 at 63–65). Marquis swore that because of inadequate lighting, he did not see the missing subflooring that ordinarily would have supported one of the door thresholds, and when he stepped on the threshold, it snapped. *See* Dkt. 177-1 at 64. He swore that when the threshold snapped, his foot slipped under the house and to the right while his body went left, snapping his right leg in three places. *See id.* He also swore that he never told Jones that he fabricated the details of this incident. *See id.* Clearly, there is a material dispute of fact as to whether this incident occurred at one of Defendants' properties and, if it did, what actually happened.

For the foregoing reasons, as to Marquis's negligence claim, the Motion (Dkt. 176) is denied.

## C.  DTPA

"The DTPA was enacted to protect consumers and allow recovery when certain deceptive acts cause economic damages." *Strickland v. Bank of N.Y. Mellon*, 838 F. App'x 815, 819 (5th Cir.

2020) (per curiam) (citing Tex. Bus. & Com. Code Ann. § 17.50 (West 2015)). "To recover under DTPA, a plaintiff must prove: (1) plaintiff is a consumer; (2) defendant is a proper defendant under DTPA; (3) defendant committed a violation of the statute; and (4) the violation caused plaintiff damages." *Id.* (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)).

Among other arguments, Defendants argue that Plaintiffs brought this claim outside of the DTPA's two-year statute of limitations. *See* Dkt. 176 at 14. Plaintiffs respond that Defendants did not timely plead this defense. *See* Dkt. 177 at 18.

Defendants are correct that the statute of limitations for DTPA actions is two years. *See* Tex. Bus. & Com. Code Ann. § 17.565 (West 2021) ("All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."). The allegedly deceptive conduct, i.e., Sadeghian's promises to pay Marquis a certain amount for work performed, provide an inhabitable residence for Marquis and his family, and not charge Marquis rent to live on the property, occurred in 2014. *See* Dkt. 151 at 2–3; Dkt. 176-1 at 1. Plaintiffs filed their original complaint in 2019. *See* Dkt. 1. Therefore, this action was brought more than two years after the allegedly deceptive conduct took place. Plaintiffs do not contend otherwise.

In responding to a pleading, a litigant must "affirmatively state any . . . affirmative defense," which includes, among others, statute of limitations. FED. R. CIV. P. 8(c)(1). While failure to follow this rule can lead to waiver of the defense, this rule has "some play in the joints."

*Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008).[11] "Where the [affirmative defense] is raised in the trial court in a manner that does not result in unfair surprise . . . technical failure to comply precisely with Rule 8(c) is not fatal." *Id.* (internal quotation and citation omitted); *see also Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) ("A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense."). Therefore, "if the defense 'is raised at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond,' [the court] generally will not find the defense waived." *Solomon v. Spalitta*, 484 F. App'x 883, 885 (5th Cir. 2012) (per curiam) (quoting *Rogers*, 521 F.3d at 385–86). Ultimately, "defenses raised for the first time in motions for summary judgment may, under the proper circumstances, be considered." *Id.* (citing *Standard Waste Sys. Ltd. v. Mid–Continent Cas. Co.*, 612 F.3d 394, 398–99 (5th Cir. 2010)).[12]

---

[11] Waiver is "'the intentional relinquishment or abandonment of a known right.'" *Gladden v. Coca-Cola Co.*, No. 3:21-CV-1893-B, 2022 WL 2209945, at *3 (N.D. Tex. June 17, 2022) (quoting *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017)). A court cannot restore a waived right. *Id.* (citing *Wood v. Milyard*, 566 U.S. 463, 472–73 (2012)).

[12] Previously, the Fifth Circuit has indicated that if an affirmative defense is not pled in the defendant's response to the complaint, the affirmative defense is therefore waived. *See, e.g.*, *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) ("The Federal Rules require an affirmative defense to be pleaded; failure to plead such a defense constitutes waiver." (citing *Trinity Carton Co. v. Falstaff Brewing Corp.*, 767 F.2d 184, 194 (5th Cir. 1985))). More recently, the Fifth Circuit has clarified that an affirmative defense is not necessarily waived by virtue of its not having been pled:

> Under Rule 8(c), a defendant must affirmatively state an affirmative defense in its response . . . Failure to do so waives the defense . . . However, a technical failure to comply precisely with Rule 8(c) is not fatal. A defendant does not waive a defense if it was raised at a pragmatically sufficient time and did not prejudice the plaintiff in its ability to respond. There is some play in the joints as long as the plaintiff is not surprised by the affirmative defense, nor prejudiced in their ability to respond.

*Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 838–39 (5th Cir. 2022) (per curiam) (internal quotations omitted). District courts within the Fifth Circuit have likewise acknowledged the Fifth Circuit's language suggesting absolute waiver but still found that an affirmative defense is not necessarily waived by virtue of its not having been pled. *See, e.g.*, *Rodgers v. Hopkins Enters. of Ms., LLC*, No. CV 17-6305, 2018 WL 3104288, at *7 (E.D. La. June 21, 2018); *Campos v. Lone Star Wheel Components Inc.*, No. 3:13-CV-4088-N, 2015 WL 1112053, at *4 (N.D. Tex. May 29, 2015).

In response to Defendants' statute of limitations argument, Plaintiffs simply assert that "Defendants did not plead the statute of limitations to the DTPA action." Dkt. 177 at 18. Indeed, Defendants did not plead this affirmative defense as to Plaintiffs' DTPA claim. *See* Dkts. 9, 17, 159. However, Plaintiffs do not argue that Defendants' raising the defense for the first time in the Motion (Dkt. 176) prejudiced Plaintiffs' ability to respond to the defense. The Court does not see any reason why Plaintiffs would be prejudiced by the fact that this defense was raised for the first time in the Motion (Dkt. 176). The question of when the allegedly deceptive conduct occurred is not in dispute, and the Motion (Dkt. 176) was filed over five months before the final pretrial conference was scheduled to take place. Therefore, the Court finds this defense was not waived. *Accord Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578 (5th Cir. 2009) ("[T]hough [the defendant] raised qualified immunity fifty-two months after the complaint was filed, substantial time [six months before the pretrial conference] remained before trial for plaintiff to respond to the defense."); *Gladden*, 2022 WL 2209945, at *4 ("[The defendant] did not waive the [statute of limitations] defense because [the plaintiff] had sufficient notice and a chance to argue the defense.").

Because the statute of limitations ran on Plaintiffs' DTPA claim prior to their commencing this lawsuit, and because Defendants did not waive the defense, the Motion (Dkt. 176) is granted as to Plaintiffs' DTPA cause of action.[13]

### D.  Spoliation

The Third Amended Complaint (Dkt. 151) lists spoliation as a "Count" and states, "Plaintiffs request that a spoliation instruction be given to the jury." Dkt. 151 at 7. In response to Defendants' argument that spoliation is not a separate cause of action in Texas, Plaintiffs concede

---

[13] The Court does not reach Defendants' other arguments regarding Plaintiffs' DTPA claim.

this point and clarify that "[c]ounsel included spoliation in his Complaint to give fair warning to the Defendants of an issue with respect to which he will probably submit an instruction." Dkt. 178 at 1–2. Indeed, spoliation is not a separate cause of action in Texas. *See Trevino v. Ortega*, 969 S.W.2d 950, 951 (Tex. 1998) ("Because we determine that spoliation does not give rise to independent damages, and because it is better remedied within the lawsuit affected by spoliation, we decline to recognize spoliation as a tort cause of action.").

Accordingly, as to Plaintiffs' purported spoliation cause of action, the Motion (Dkt. 176) is denied as moot.[14]

## IV.    CONCLUSION

For the foregoing reasons, the Motion (Dkt. 176) is **GRANTED IN PART** and **DENIED IN PART** as follows: the Motion (Dkt. 176) is **GRANTED** as to Plaintiffs' DTPA claim, **DENIED** as to Plaintiffs' FLSA claim and Billy Marquis's negligence claim, and **DENIED AS MOOT** as to Plaintiffs' purported spoliation claim.

**So ORDERED and SIGNED this 10th day of April, 2023.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

---

[14] The Court clarifies that at this time, it does not rule on the propriety of a spoliation instruction.

23